# United States Court of Appeals
## For the First Circuit

No. 04-2607

EVGENY OKMYANSKY,

Plaintiff, Appellant,

v.

HERBALIFE INTERNATIONAL OF AMERICA, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Selya, Circuit Judge,
Hill,* Senior Circuit Judge,
and Lynch, Circuit Judge.

Joel Z. Eigerman, with whom Pavel Bespalko was on brief, for appellant.
Annapoorni R. Sankaran, with whom Gary R. Greenberg, Louis J. Scerra, Jr., and Greenberg Traurig, LLP were on brief, for appellee.

July 15, 2005

_____
*Of the Eleventh Circuit, sitting by designation.

**SELYA**, **Circuit Judge**.    Plaintiff-appellant Evgeny Okmyansky claims an entitlement, contractually and under equitable principles, to certain commissions and royalties.    The district court spurned the plaintiff's entreaties and granted summary judgment for defendant-appellee Herbalife International of America, Inc. (Herbalife).    Okmyansky v. Herbalife Int'l of Am., Inc., 343 F. Supp. 2d 57, 60-62 (D. Mass. 2004).    Concluding, as we do, that neither the contract between the parties nor any equitable doctrine warrants a different result, we affirm.

## I.  BACKGROUND

We rehearse the facts in the light most favorable to the summary judgment loser (here, the plaintiff), consistent with record support.    Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 702 (1st Cir. 1993).

The defendant is a Nevada corporation that maintains its principal place of business in California.    It manufactures weight-management products, dietary supplements, and other personal care items.    The company markets its wares through a multi-level network of independent distributors, who can earn money through three channels.    First, distributors purchase products from the company at a sizable discount, mark them up, and resell them to consumers. Second, distributors become sponsors by enlisting recruits (who, in the idiom of the trade, are known as "downline distributors") and earn commissions on products that these downline distributors

-2-

purchase from the company. Finally, distributors benefit from the recruiting efforts of their downline distributors as the defendant pays royalties to sponsors based on purchases attributable to their recruits (who, in the idiom of the trade, become part of the initial distributor's "lineage"). The sustainability of this business model depends on ensuring that each downline distributor is assigned to a single sponsor.

The plaintiff, a foreign national who resided in Massachusetts between 1995 and 2003, became a Herbalife distributor by executing a distributorship contract (the Contract) on July 21, 1992. The parties agree that the Contract incorporates by reference the terms of Herbalife's career book, which contains both a sales and marketing plan (the Plan) limning the terms of compensation, and the rules of conduct and distributor policies (the Rules).[1]

The Rules are of particular interest here. Pertinently, Rule 4-A specifies that "[a]n individual may have only one Herbalife Distributorship under one Sponsor." That command is designed to prohibit dual distributorships, that is, the pairing of a single downline distributor with more than one sponsor. Rule 4-C

---

[1]The defendant has published several updated versions of the career book since 1992. Neither party asserts that there are relevant differences among the various editions. To eliminate any question, the parties have agreed that a particular set of documents submitted by the plaintiff during the summary judgment proceedings embodies the relevant contractual terms. We proceed accordingly.

speaks to the parties' rights in the event of a violation of Rule 4-A:

> If Herbalife determines that an individual has signed an Application for Distributorship, or has worked or assisted in the development of another Distributorship . . . while obligated to a prior Distributorship, Herbalife has sole and absolute discretion to determine the disposition of both Distributorships, as well as any penalties or sanctions it deems necessary and appropriate for the Distributorship and the Sponsoring organization(s).

Rule 4-C also states that the first sponsor to recruit a distributor and have him execute a contract with the defendant "is considered the valid Distributorship."

Other generally applicable provisions of the Rules cede broad discretion to the defendant with respect to violations of the Rules. For example, Rule 8-L stipulates that when an infraction has occurred, the defendant "may in its sole discretion take whatever actions or measures it deems necessary and appropriate, including but not limited to . . . suspension of earnings." Similar language in Enforcement Procedure 1-G says that, should a violation occur, the defendant, "[i]n its sole and absolute discretion . . . may impose any remedy or sanction it determines best addresses the issue."

In 1994, the plaintiff alerted the defendant that as many as twenty-eight of his downline distributors had been enticed by pirate sponsors to sign second distributorship agreements in

violation of the prohibition on dual distributorships. He requested, inter alia, that the defendant restore to him the commissions and royalties attributable to these downline distributors. The defendant's response was painfully slow; for a period of approximately four years, it investigated the entangled lineages. The defendant eventually determined that certain of the identified downline distributors had belonged in the plaintiff's lineage. By letter dated February 9, 1999, the defendant informed the plaintiff that it would restore these downline distributors to his lineage on a going-forward basis, but without "monetary adjustments." Put bluntly, the defendant refused to compensate the plaintiff for the commissions and royalties that had been misallocated during the currency of the dual distributorships.

## II. TRAVEL OF THE CASE

On February 24, 2003, the plaintiff brought suit in a Massachusetts state court alleging breach of contract. In an amended complaint, he added counts based on quantum meruit, promissory estoppel, and implied contract.

Noting the diverse citizenship of the parties and the existence of a controversy in the requisite amount, the defendant removed the case to the federal district court. See 28 U.S.C. §§ 1332(a), 1441. Following a period of pretrial discovery, the

district court directed the parties to file cross-motions for summary judgment. The parties complied.[2]

The cross-motions placed the parties at loggerheads. The plaintiff argued that summary judgment ought to be entered in his favor because the Contract entitled him to the diverted payments. For its part, the defendant argued that it was entitled to judgment as a matter of law because its decision not to compensate the plaintiff for the bygone purchases made by the disputed downline distributors and their progeny was within the discretion conferred by the Contract. In due course, the lower court granted the defendant's motion and denied the plaintiff's cross-motion. The court concluded that under the plain terms of the Contract, it was within the defendant's discretion to refuse to reallocate the diverted payments and, therefore, no breach of contract had occurred. Okmyansky, 343 F. Supp. 2d at 61-62. This timely appeal ensued.

## III. ANALYSIS

On appeal, the plaintiff advances two sets of arguments in support of his claim of error. First, he asserts that the Contract obligated the defendant to recompense him for the diverted payments. As a subset of this argument, he maintains that he had

---

[2]In their cross-motions, the parties sparred over whether the plaintiff, if entitled to prevail on the merits, also was entitled to summary judgment on the issue of damages. That issue is not before us and we omit any further reference to it.

fully complied with the Rules, so the defendant was not at liberty to exercise its contractual discretion to extinguish the payment obligation.[3] Second, he asseverates that even if the Contract does not protect him, he is entitled to recovery on an equitable basis. After delineating the standard of review, we address each of these arguments in turn.

## A.

## Standard of Review.

A nisi prius court may grant summary judgment whenever "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). These components are familiar: an issue is genuine if "a reasonable jury could resolve the point in favor of the nonmoving party," United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st Cir. 1992), and a fact is material if it "has the capacity to sway the outcome of the litigation under the

---

[3]Ceding discretion in a contract is not tantamount to subjecting oneself to legalized tyranny. Every contract contains an implied covenant of good faith and fair dealing. See, e.g., Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 61 (1st Cir. 2001) (applying Massachusetts law). Consequently, not even the reservation of absolute discretion can clear the way for a totally arbitrary and unprincipled exercise of a contracting party's power. Here, however, the plaintiff has not claimed a breach of the covenant of good faith and fair dealing, nor has he brought suit for unfair or deceptive trade practices. See generally Mass. Gen. Laws ch. 93A, §§ 2, 11.

applicable law," Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995).

After the moving party has averred that no genuine issue of material fact stands in the way of brevis disposition, the nonmovant bears the burden of demonstrating the movant's error. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Once the court is persuaded that no such dispute exists, summary judgment is appropriate so long as the applicable law entitles the movant to prevail. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

We review a grant of summary judgment de novo. Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005). In conducting this review, we peruse the record in the light most amiable to the appellant, drawing all reasonable inferences in his favor. Nat'l Amusements, 43 F.3d at 735. We are not wed to the lower court's rationale but, rather, may affirm the entry of summary judgment on any ground made manifest by the record. Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999).

## B.

### The Breach of Contract Claim.

The parties agree that the Contract, consisting of the distributorship agreement, the Plan, and the Rules, is valid and that its language controls the resolution of this case. They also agree that state substantive law applies in this diversity action

and that our choice of law must be guided by the choice-of-law tenets of the forum state (here, Massachusetts). See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). The parties disagree, however, on which state's substantive law a Massachusetts court would apply; the plaintiff favors Massachusetts law, while the defendant extols the virtues of California law.

This is a tempest in a teapot. The parties concede that the approach to interpreting the Contract would be the same under either legal regime. We have said before, and today reaffirm, that when the resolution of a choice-of-law determination would not alter the disposition of a legal question, a reviewing court need not decide which body of law controls. See Royal Bus. Group, Inc. v. Realist, Inc., 933 F.2d 1056, 1064 (1st Cir. 1991); Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1092 (1st Cir. 1989). So it is here.[4]

We move next to the Contract itself. In construing it, we adhere to the bedrock principle that, in the absence of linguistic ambiguity, the text of a contract dictates its meaning. Stony Brook R.R. Corp. v. Boston & Me. R.R., 157 N.E. 607, 610 (Mass. 1927). In following that principle, "words that are plain and free from ambiguity must be construed in their usual and ordinary sense." Ober v. Nat'l Cas. Co., 60 N.E.2d 90, 91 (Mass.

_____

[4]Although we could cite Massachusetts and California cases interchangeably without affecting the outcome of this appeal, we henceforth refer, for simplicity's sake, to Massachusetts case law.

-9-

1945); accord <u>Citation Ins. Co.</u> v. <u>Gomez</u>, 688 N.E.2d 951, 952 (Mass. 1998).

The plaintiff concedes, as he must, that the Contract grants more than a modicum of discretion to the defendant. He argues, however, that the defendant cannot employ this discretion to address a violation of the dual distributorship prohibition in a way that will disadvantage an "innocent party." There is, however, a rather large fly in the ointment: the plaintiff's position is in direct conflict with the unequivocal language of Rule 4-C, which affords the defendant "sole and absolute discretion to determine the disposition of both Distributorships." The defendant did no more than exercise this discretion. It decided, in effect, to consider the disputed downline distributors to be part of other lineages during the period of investigation, to shift those distributorships back to the plaintiff's lineage once the investigation had concluded, and to allow payment of commissions and royalties to flow accordingly (without any retrospective adjustments).

That disposition — and its attendant financial consequences — were well within the encincture of the "sole and absolute" authority that Rule 4-C ceded to the defendant in connection with dual distributorship problems. After all, Rule 4-C by its terms grants the defendant discretion to impose any "penalties or sanctions it deems necessary and appropriate for the

. . . Sponsoring organization(s)" that are ensnared in a dual distributorship dilemma.  This language shows beyond a shadow of a doubt that the drafters of the Rule contemplated the possibility that both sponsors might be affected by the company's disposition of the conflicting claims.  The plain meaning of the provision is that in all dual distributorship situations, the defendant is the sole decisionmaker empowered to disentangle the lineages and dictate the associated financial consequences.

To cinch matters, the defendant's exercise of wide-ranging discretion here is consistent with other provisions of the Contract dealing with the company's enforcement of the Rules.  For example, Rule 8-L allows the defendant to respond to an infraction of the Rules with "whatever actions or measures it deems necessary and appropriate," including "suspension of earnings."  Enforcement Procedure 1-G reiterates the point, noting that, in the event of a violation of the Rules, the company retains "sole and absolute discretion" to "impose any remedy or sanction it determines best addresses the issue."  These terms, by the plain language, empower the defendant to act as it did.  The result may not be altogether attractive — but it is the result for which the parties bargained.

In an effort to blunt the force of the plain meaning of the provisions we have mentioned, the plaintiff presents three counter-arguments.  None is persuasive.

He first contends that the Plan, which outlines the formulae for compensation based upon the purchases made by the distributors in a sponsor's lineage, establishes an absolute right to payment of the disputed commissions and royalties. This right, the plaintiff asserts, is a core object of the Contract and cannot be extinguished unilaterally. That line of argumentation overlooks the hoary adage that a contract must be read as a whole. Given v. Commerce Ins. Co., 796 N.E.2d 1275, 1277 (Mass. 2003) ("We interpret the words of [the contract] in light of their plain meaning, giving full effect to the document as a whole." (citation omitted)); Cullen Enters., Inc. v. Mass. Prop. Ins. Underwriting Ass'n, 507 N.E.2d 717, 725 n.27 (Mass. 1987) (similar). That adage is applicable here.

Although the Plan describes how sponsors will be compensated, Rule 4-C limits any right of payment in a dual distributorship situation by conferring on the defendant the broad authority to determine the flow of payments relating to a distributorship that is the subject of competing sponsorship claims. Under that regime — a regime to which the plaintiff agreed when he executed the Contract — a sponsor bears the risk that a distributor in his lineage will impermissibly enroll in another distributor's lineage. Any supposed entitlement to payment must be read in light of this shifted risk.

The same principle defeats the plaintiff's second foray, in which he suggests that Rule 11-A constrains the defendant's exercise of its discretion. Rule 11-A states that the "Distributor/Sponsor relationship" is "the foundation" of the Plan and that the "rules of the company protect the rights of the Sponsor." This is general language, aspirational in nature. Even if we were to interpret it as something more, we would have to read it in light of the Contract as a whole.

That gets the grease from the goose. Rule 4-C, in empowering the defendant to determine the disposition of dual distributorship claims, allows it to take steps to define the relative rights of the competing sponsors. Since Rule 11-A does not diminish, let alone eliminate, the defendant's reserved discretion to declare a sponsor's rights in a Rule 4 situation, it does not advance the plaintiff's cause.

The plaintiff's third contention derives from his reading of the discretionary clauses themselves. He posits that the defendant's discretion may operate only against those who violate the Rules, not against those who adhere scrupulously to them. The difficulty with this proposition is textual: the plain language of the Contract imposes no such limitation on the exercise of the manufacturer's discretion.

Although the discretion clauses in Rule 4-C, Rule 8-L, and Enforcement Procedure 1-G are triggered by a violation, the

ensuing grant of discretion does not restrict the defendant's remedial authority to actions taken against the transgressor or even to actions that do not detrimentally affect innocent parties. Rather, the grant of discretion is strikingly broad; the company may "impose any remedy . . . it determines best addresses the issue." That language plainly encompasses the possibility that the solution fashioned by the company may have collateral consequences for those who are without fault.

The plaintiff mounts a subsidiary argument that the term "sanction," as used in Rule 4-C and Enforcement Procedure 1-G, can only be read to refer to an action taken against a wrongdoer. This subsidiary argument has a patina of plausibility. Normally — and this case is not abnormal — courts may rely upon standard dictionaries as interpretive aids in discerning the meaning of a contractual term. See In re Liquidation of Am. Mut. Liab. Ins. Co., 802 N.E.2d 555, 560 (Mass. 2004) (stating that "[n]ormally, a dictionary definition of a term is strong evidence of its common meaning"); see also United States v. Nason, 269 F.3d 10, 16 (1st Cir. 2001). A typical dictionary source defines sanction as "[a] penalty or coercive measure that results from failure to comply with a law, rule, or order." Black's Law Dictionary 1369 (8th ed. 2004). Thus, the construct that a sanction is an action ordinarily taken against a wrongdoer has some traction.

In the last analysis, however, that construct does not take the plaintiff very far.  Rule 8-L also allows the defendant to take "actions and measures it deems necessary and appropriate"; Enforcement Procedure 1-G permits it to effectuate "any remedy" to address an issue related to a violation.  The commonsense meaning of this language encompasses actions that are not punitive in nature.  See, e.g., id. at 1320 (defining "remedy" as "[t]he means of enforcing a right or preventing or redressing a wrong," without any reference to a wrongdoer).  The defendant's disposition of the competing dual distributorship claims easily can be characterized either as a "remedy" for an intolerable situation or as an action that the company, in its sole discretion, deemed necessary and appropriate to rectify that situation.

The plaintiff attempts to parry this thrust by arguing that the very fact that the term "remedy" could be construed to authorize the defendant to take actions detrimental to innocent distributors renders that reading "contrary to the manifest intent of the contract."  Appellant's Br. at 19.  This argument is circular:  the manifest intent of contracting parties must be gleaned, in the first instance, from the plain meaning of the contractual language.  See Hakim v. Mass. Insurers' Insolvency Fund, 675 N.E.2d 1161, 1164 (Mass. 1997).  The fact that, in ordinary usage, the term "remedy" has a broad meaning does not by some mysterious alchemy render it contrary to the parties'

manifested intent. Whether or not a particular party had considered the breadth of that term before signing on the dotted line is a different matter.

The short of it is that the Contract manifests an intent to grant the defendant wide latitude to protect its interest in maintaining an ordered hierarchy of distributorships. By conferring sole and absolute discretion upon the defendant to deal with dual distributorships, the Contract placed the risk of financial loss associated with such situations on the sponsors. This result is a function of the language of the Contract and is perfectly consistent with the business realities that the defendant faced. The incidence of dual distributorships places the manufacturer in an untenable position. From a commercial standpoint, it is a reasonable solution to say, in effect, that the manufacturer will pay commissions and royalties only once; that it will investigate colorable complaints; and that, after resolving a complaint, its resolution will operate only prospectively.[5] Had the plaintiff wanted better protection for his lineage, he should have bargained for a more nuanced arrangement. Accordingly, we conclude that the plaintiff's right to payment was circumscribed by the defendant's power to craft a remedy. Since the defendant acted

---

[5]We emphasize that, here, the defendant did not receive a windfall but, rather, merely misallocated the payments that were due. Had it paid neither claimant, this might well be a different case.

-16-

within the sphere of this authority in declining to pay the plaintiff commissions and royalties that it already had paid (albeit mistakenly) to another sponsor, the breach of contract claim fails. The bottom line is that there was no breach.

## C.

### Equitable Claims.

The plaintiff's fallback position consists of an attempt to resurrect the equitable claims that were presented in his amended complaint but never mentioned in the summary judgment proceedings. This is both too late and too little.

The argument is made too late because claims not presented to the district court cannot be introduced for the first time on appeal. See United States v. Bongiorno, 106 F.3d 1027, 1034 (1st Cir. 1997); Teamsters Union v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992). When a plaintiff asserts a particular claim in a complaint and then seeks summary judgment on all claims but fails to present arguments in support of that claim, plaintiff is left in the same position as if he had not asserted the claim at all. See Rocafort v. IBM Corp., 334 F.3d 115, 121 (1st Cir. 2003).

That is the situation here. The plaintiff sought summary judgment on all claims, but relied exclusively upon his battery of breach of contract arguments, to the exclusion of his equitable theories. That constitutes a waiver: he cannot now raise equitable claims that he could have, but did not, assert before the

-17-

district court. See B & T Masonry Constr. Co. v. Pub. Serv. Mut. Ins. Co., 382 F.3d 36, 40 (1st Cir. 2004) (explaining that legal theories not squarely raised below are not preserved for appeal).

In all events, the plaintiff's equitable claims have too little substance. The plaintiff concedes the existence of a valid express contract between the parties — and the existence of such a contract bars the application of the equitable doctrines that he belatedly invokes. See Boswell v. Zephyr Lines, Inc., 606 N.E.2d 1336, 1342 (Mass. 1993) (explaining that where a valid contract exists, "the law need not create a quantum meruit right to receive compensation for services rendered"); Zarum v. Brass Mill Materials Corp., 134 N.E.2d 141, 143 (Mass. 1956) (holding that "[t]he law will not imply a contract where there is an existing express contract covering the same subject matter"); id. (noting that an express contract leaves "no room . . . for recovery on principles of unjust enrichment").

## IV. CONCLUSION

We need go no further. For the reasons elucidated above, we hold that the defendant did not breach the Contract when it declined to remunerate the plaintiff in connection with the diverted payments. Similarly, we hold that the defendant is not liable to the plaintiff in equity. Accordingly, the district court did not err in granting summary judgment in the defendant's favor.

-18-

**Affirmed**.