NATHAN EIGERMAN vs. PUTNAM INVESTMENTS, INC.,
& another.[1]

Suffolk. November 6, 2007. - December 20, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Contract,* Employment, Performance and breach, Implied covenant of good
faith and fair dealing. *Practice, Civil,* Motion to dismiss.

In a civil action alleging that the defendant employer had committed a breach
of the plaintiff's contract of employment when the employer adopted an
informal policy discouraging the plaintiff from exercising his right to
tender, for redemption by the employer, certain shares of stock received
pursuant to an employee equity participation plan, the judge properly
dismissed the complaint for failure to state a claim upon which relief could
be granted, where language in the plan stated that the employer had no
obligation to purchase such shares tendered by employees for redemption
[285-287]; further, the plaintiff had no cause of action for breach of the
implied covenant of good faith and fair dealing, where the plaintiff could
not reasonably have understood, or expected, that the employer was obligated
to purchase such shares, and where the adoption of the informal policy was
within the discretion of the employer [287-290].

CIVIL ACTION commenced in the Superior Court Department on
June 3, 2004.

A motion to dismiss was heard by *Patrick F. Brady*, J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*Jonathan M. Albano* (*Carol E. Head* with him) for the
defendants.

*Joel Z. Eigerman* for the plaintiff.

*Benjamin Robbins*, for New England Legal Foundation &
another, amici curiae, submitted a brief.

*Elizabeth A. Rodgers & Philip J. Gordon*, for National Employ-
ment Lawyers' Association, amicus curiae, submitted a brief.

GREANEY, J. The plaintiff seeks declaratory relief and monetary

[1]Putnam Investment Management, LLC.

damages against the defendants Putnam Investments, Inc. (Putnam), and its subsidiary, Putnam Investment Management, LLC (Management), for breach of his contract of employment. The breach allegedly occurred when Putnam adopted an informal policy discouraging the plaintiff[2] from exercising his right to tender, for redemption by Putnam, shares of Class B common stock received pursuant to an employee equity participation plan. A judge in the Superior Court allowed the defendants' motion to dismiss the complaint, pursuant to Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), for failure to state a claim. The Appeals Court reversed. See *Eigerman* v. *Putnam Invs., Inc.*, 66 Mass. App. Ct. 222 (2006). We allowed the defendants' application for further appellate review, and we now affirm the judgment.

1. The complaint alleges the following facts, which we accept, together with any favorable inferences reasonably drawn therefrom, as true for purposes of this appeal. See *Ginther* v. *Commissioner of Ins.*, 427 Mass. 319, 322 (1998). We do not, however, accept or set forth "legal conclusions [in the complaint] cast in the form of factual allegations." *Schaer* v. *Brandeis Univ.*, 432 Mass. 474, 477 (2000). See *Papasan* v. *Allain*, 478 U.S. 265, 286 (1986). In 1997, Putnam created a plan whereby its key employees, and those of its subsidiaries, could choose to receive shares of the company's Class B common stock.[3] According to a document entitled "Putnam Investments, Inc., Equity Participation Plan" (the document is attached to the plaintiff's complaint as an exhibit), the plan's purpose was "to foster and promote the long-term financial success of Putnam . . . by . . . enabling Putnam to attract and retain the

---

[2]The plaintiff in his complaint purports to represent members of a class of similarly situated employees and seeks certification of that class, pursuant to Mass. R. Civ. P. 23, 365 Mass. 767 (1974). The plaintiff, however, has filed no motion for class certification. In allowing the defendants' motion to dismiss the complaint, the judge did not find it necessary to address the merits of the certification issue. Nor do we.

[3]The plaintiff asserts in his complaint that Putnam Investments, Inc. (Putnam), a Massachusetts corporation, is a majority-owned subsidiary of Marsh & McClennan Companies, Inc., a Delaware corporation, and that, at all times relevant to this action, he was employed by Putnam or one of its subsidiaries, including the defendant Putnam Investment Management, LLC (Management), a Massachusetts limited liability company.

services of an outstanding management team . . . , motivating superior performance by participants in the Plan and . . . providing participants in the Plan with an ownership interest in Putnam." The document sets forth the following relevant plan details: ownership of the shares granted to employees vests over a period of four years; employees must sell all of their vested shares back to Putnam on leaving employment; and, in addition, during ten-day window periods in the spring and fall each year, employees have the option of tendering their vested shares for redemption by Putnam. The document provided a formula tying Putnam's purchase price at any set time to the past year's earnings of the company.

The plaintiff, who was employed at the time by Management, became a plan participant in March, 1999. By the fall of 2001, the redemption price of the stock was $108.84 per share, which was near its all-time high value. As a consequence, the plaintiff offered his shares for repurchase pursuant to the terms of the plan. The plaintiff considered the ownership and redemption rights in Class B common stock in Putnam to be material terms of his employment contract.

On January 28, 2002, Putnam's then chairman and chief executive officer, Lawrence J. Lasser, issued a memorandum to participants in the plan (the Lasser memorandum also is attached to the plaintiff's complaint) announcing Putnam's adoption of a new "informal policy" to "encourage recipients to hold Putnam equity."[4] The Lasser memorandum stated that the sale of vested shares to meet personal needs, such as tax requirements, would be considered "acceptable and will not be questioned." The Lasser memorandum asked, however, that "prior to selling any Putnam equity during a window period for reasons other than meeting tax obligations, [an employee should] discuss the reasons behind such a sale with [the employee's] Operating Head." The memorandum indicated that sales of Putnam equity would be "track[ed]" to allow for development of "a better understanding of why people reduce or divest their Putnam equity hold-

---

[4] "Putnam" is defined in the document entitled "Putnam Investments, Inc., Equity Participation Plan" as "Putnam Investments, Inc."

ings, given the now better clarified view that Putnam equity is awarded as a *long-term incentive* vehicle" (emphasis original).[5]

The plaintiff understood the Lasser memorandum as an implicit threat that any attempt to resell the shares, for reasons other than those set forth as acceptable in the memorandum, would seriously jeopardize his employment relationship with Putnam. He asserts that the memorandum was designed to intimidate him (and other plan participants) into surrendering his contractual right under the plan to tender his vested shares for redemption. As a result of the memorandum, the plaintiff refrained from

---

[5]The entire text of the memorandum, which was from Lawrence J. Lasser to the plaintiff, dated January 28, 2002, and entitled "MEMORANDUM — PERSONAL & CONFIDENTIAL," reads as follows:

"In September, 1997, when the Putnam Equity Partnership Plan (EPP) was introduced, I wrote that we had created the Plan because:

> 'Putnam's goal has been to provide a means to give you real equity in the company you have helped create. It has been to mix long-term motivation and rewards with short-term awards. It has been to provide you with a direct financial incentive to remain and grow with Putnam. The EPP advances these goals in better aligning the interests of the owners of the company with the interests of the people who have and will create value for the owners of the company, and to make them one.'

"As I look back on the Equity Partnership Plan from the perspective of four years of experience, I believe we have for the most part accomplished those goals. However, one aspect of the plan continues to prompt questions, the sale by plan participants of vested Putnam Class B shares. In trying to determine whether to develop a policy on this, we examined the practices of other companies. Some companies have equity ownership 'targets' they want their plan participants to achieve. Other companies require plan participants to hold a specified minimum percentage of the stock they were awarded.

"I prefer we not establish a fixed policy for Putnam, hoping instead EPP participants will understand the value of the Putnam equity they have been granted, while recognizing their ownership stake in Putnam is intended as a long-term investment. Thus, the informal policy is to encourage recipients to hold Putnam equity, also recognizing it may sometimes become necessary to sell a portion of equity to meet personal needs. One example might involve taxes. As you know, the vesting of restricted Class B shares results in a taxable event. The sale of a portion of equity to meet tax withholding requirements could then become necessary for some people. A sale of this type is acceptable and will not be questioned. We ask that prior to selling any Putnam equity during a window period for reasons other than meeting tax obligations, you discuss the reasons behind such a sale with your Operating Head. I have asked T. Hoffman to track sales of equity to allow us to develop a better understanding of why people reduce or divest their Putnam equity holdings, given the now better clarified view that Putnam equity is awarded as a *long-term incentive* vehicle."

tendering any shares during 2002, when the redemption price of the shares was $74.57. Indeed, fewer than half as many shares were offered for redemption during 2002 as were offered in 2001 because the plaintiff, and others, were deterred from offering their shares by the implicit and explicit threats in the memorandum.

The plaintiff tendered all his vested shares for sale to Putnam on leaving the company in March, 2003, as the plan required him to do. By that time, the redemption price of the stock had fallen to $39.57. The plaintiff claims that had he not been deterred in 2002 by the Lasser memorandum from redeeming his shares in accordance with his rights under the plan, he would have realized $35,562.50 more on the sale of his shares. The plaintiff's complaint alleges that the defendants, by issuing the Lasser memorandum and thereby preventing him from reselling his shares of Class B common stock to Putnam, violated his employment contract. We now consider whether the judge's dismissal of the complaint for failure to state a claim was warranted.[6]

2. Under the established standard by which a motion pursuant to rule 12 (b) (6) is decided, the complaint will survive if it appears that the plaintiff may be entitled to relief, "even though the particular relief he has demanded and the theory on which he seems to rely may not be appropriate." *Nader* v. *Citron*, 372

---

[6]The only facts appropriate for consideration in deciding a motion to dismiss are, as has been noted, those drawn from factual allegations contained within the complaint or within attached exhibits. See *Schaer* v. *Brandeis Univ.*, 432 Mass. 474, 477 (2000). In deciding the motion in this case, in addition to examining the complaint, a copy of the plan, and the Lasser memorandum, as well as considering the arguments of the parties, the judge may have reviewed the plaintiff's affidavit, which was filed in opposition to the defendants' motion to dismiss. It is clear from the judge's decision, however, that he did not rely on any matter contained in the affidavit, which provides legal arguments and conclusory statements, but adds nothing material to the facts already alleged in the complaint. As did the judge, we disregard the affidavit, and the alleged facts contained therein, in resolving this appeal. Its filing did not convert the challenged judicial determination into one for summary judgment under Mass. R. Civ. P. 56, as amended, 436 Mass. 1404 (2002). See *Stop & Shop Cos.* v. *Fisher*, 387 Mass. 889, 892 (1983) ("category of 'matters outside the pleading' is broad, but even when construed broadly, such matters must provide some relevant factual information to the court"); *Orion Ins. Co.* v. *Shenker*, 23 Mass. App. Ct. 754, 757 (1987) (no conversion where affidavits failed to provide factual information relevant to determination of motion under Mass. R. Civ. P. 12 [b] [6], 365 Mass. 754 [1974]).

Mass. 96, 104 (1977). A motion to dismiss will be allowed only where it is certain that the plaintiff is not entitled to relief under any combination of facts that could be drawn, or reasonably inferred, from the allegations contained in the complaint. See *Spinner* v. *Nutt*, 417 Mass. 549, 550 (1994). Put differently, a motion to dismiss must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Nader* v. *Citron*, *supra* at 98, quoting *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957). In spite of the generous standard that guides our review, we conclude that the plaintiff has set forth no facts that would entitle him to relief.[7]

It is true, as the plaintiff points out, that the language of the plan provided no restriction on his right to tender any portion of his vested shares for redemption by Putnam, other than the temporal provision that any tender, for nonemergency purposes, must take place during certain windows of time. The plaintiff in his complaint, however, overlooks other language in the plan that is clearly relevant and, in our view, dispositive of his claim. That language provides that "Putnam shall have no obligation to purchase such Class B Shares" tendered by employees for

---

[7]The defendants' motion to dismiss was filed on August 3, 2004, and allowed by the judge on December 16, 2004. On May 21, 2007, the United States Supreme Court issued its decision in *Bell Atl. Corp.* v. *Twombly*, 127 S. Ct. 1955 (2007), a case in which the Court was called on to evaluate the adequacy of pleadings alleging an antitrust conspiracy, in violation of the Sherman Act, 15 U.S.C. § 1 (2000). The Court noted, *id.* at 1968, quoting *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957), that the traditional formula for review of a complaint challenged by a motion filed pursuant to Fed. R. Civ. P. 12 (b) (6), often recited as "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," would, if understood literally, lead to the survival of "a wholly conclusory statement of claim [on the] possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Bell Atl. Corp.* v. *Twombly*, *supra*. A more appropriate inquiry, the Court suggested, is whether facts alleged in the complaint "raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965, citing 5 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 1216, at 235-236 (3d ed. 2004). The *Bell Atlantic* case does not affect our resolution of this case, because the decision followed the dismissal of the plaintiff's complaint. In a future case, we may consider whether we should adopt the *Bell Atlantic* standard for application to complaints that are the subject of a motion to dismiss pursuant to Mass. R. Civ. P. 12 (b) (6).

redemption, and it appears as an express term of the provisions of the plan dealing with the treatment of Class B shares held on the termination of employment or acquired thereafter; unforeseen personal hardship; and the sale of Class B shares and restricted stock to Putnam and the cancellation of options. In light of this language, we cannot accept the bare assertion in the plaintiff's complaint that by sending the Lasser memorandum to the plaintiff, the defendants violated the terms of the plan and violated his contract of employment. See *Schaer* v. *Brandeis Univ.*, 432 Mass. 474, 477 (2000) ("we do not accept legal conclusions cast in the form of factual allegations"). The interpretation of a contract is a question of law for the court. Whether a contract is ambiguous is also a question of law. See *Fashion House, Inc.* v. *K Mart Corp.*, 892 F.2d 1076, 1083 (1st Cir. 1989). There is no ambiguity here that would allow a court to search for an intent of the parties not to be held strictly to the plain terms of the contract language (an intent, the plaintiff argues, that may be seen in Putnam's consistent past redemption of shares, its valuation of the stock for tax purposes, and other alleged conduct on the part of the defendants). The plaintiff has not stated a claim for breach of contract because even if he had tendered his shares, Putnam had no legal obligation under the plan to purchase them.

The plaintiff fares no better under the law of implied covenant of good faith and fair dealing, a common-law doctrine applicable to every contract in Massachusetts. See *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 473 (1991). We recently had occasion to consider the doctrine in the context of a motion to dismiss a complaint filed by a holder of stock in a biotechnology corporation's biosurgery division against the corporation and its individual directors. See *Chokel* v. *Genzyme Corp.*, 449 Mass. 272, 276 (2007). We stated that "[t]he purpose of the implied covenant is to ensure that neither party interferes with the ability of the other to enjoy the fruits of the contract, [*Anthony's Pier Four, Inc.* v. *HBC Assocs.*, supra at 471-472], and that, when performing the obligations of the contract, the parties 'remain faithful to the intended and agreed expectations' of the contract, *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004). A breach occurs when one

party violates the reasonable expectations of the other. *Id. Cadle Co.* v. *Vargas*, 55 Mass. App. Ct. 361, 366 (2002), quoting Restatement (Second) of Contracts § 205 (1979). However, '[t]he scope of the covenant is only as broad as the contract that governs the particular relationship.' *Ayash* v. *Dana-Farber Cancer Inst.*, 443 Mass. 367, 385, cert. denied sub nom. *Globe Newspaper Co.* v. *Ayash*, [546 U.S. 927] (2005). The covenant does not supply terms that the parties were free to negotiate, but did not, *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp.*, *supra* at 388, nor does it 'create rights and duties not otherwise provided' for in the contract, *Ayash* v. *Dana-Farber Cancer Inst.*, *supra*, quoting *Uno Restaurants, Inc.* v. *Boston Kenmore Realty Corp.*, *supra* at 385." *Chokel* v. *Genzyme Corp.*, *supra*.

The complaint in the *Chokel* case alleged that the defendant directors committed a breach of the covenant of good faith and fair dealing implied in the defendant corporation's articles of organization when they publicly announced an exchange of bio-surgery stock for shares of general division stock. The plaintiff alleged that the timing of the announcement was designed to maximize the financial benefit to the individual directors, as shareholders of general division stock, and resulted in a substantial financial loss to the plaintiff. See *id.* at 273-274. While *Chokel*'s factual context differs from the present case, the question to be resolved is similar, and our discussion in the *Chokel* case directs our answer to the question whether the plaintiff has a cause of action for breach of the implied covenant. He does not.

The plaintiff could not reasonably have understood, or expected, that Putnam was obligated to purchase vested shares tendered by employees during the semiannual periods of time or otherwise. The plaintiff, who was professionally employed in the investment industry, must have been fully aware of the restrictive language in the plan.[8] Moreover, in a section entitled "Administration," the plan reserves to Putnam's board of direc-

---

[8]The plaintiff does not allege that he was unaware of the terms of the plan, nor could he do so. A separate agreement (which is attached to the complaint as part of the plan) provides, among other things, that a participant thoroughly has reviewed the terms and conditions of the plan. The plaintiff alleges only that we should disregard the unambiguous terms of the plan in favor of (what he alleges to be) an alternate, more practical understanding between the par-

tors the authority to "determine whether to repurchase Class B Shares pursuant to the Plan and the terms and conditions of any such repurchase." Further, the plan permits the committee responsible for the plan's administration to exercise authority to "prescribe, amend and rescind rules and regulations relating to the administration of the Plan, to provide for conditions and assurances deemed necessary or advisable to protect the interests of Putnam and [Management], and to make all other determinations necessary or advisable for the administration and interpretation of the Plan in order to carry out its provisions and purposes." The plaintiff cannot have misunderstood the broad discretion on the part of Putnam and the committee to administer the plan in the exercise of their business judgment, including use of their authority under the plan to modify the terms of the plan, from time to time, or to decline to redeem the plaintiff's vested shares at any time. Any expectation otherwise on the plaintiff's part, as matter of contract law, would not be reasonable. See *Chokel* v. *Genzyme Corp.*, *supra* at 277 (contract language allowed for stock exchange "at any time"). See also *Okmyansky* v. *Herbalife Int'l of Am., Inc.*, 415 F.3d 154, 159 (1st Cir. 2005) (pointing out "a rather large fly in the ointment: the plaintiff's position is in direct conflict with the unequivocal language of [the plan]"). In sum, the implied covenant of good faith and fair dealing cannot create rights and duties that are not already present in the contractual relationship. The covenant concerns the manner in which existing contractual duties are performed. See *Ayash* v. *Dana-Farber Cancer Inst.*, *supra* at 385. Putnam was bound to act in accordance with the nature of the obligations created in the plan.

We now consider whether the Lasser memorandum is susceptible to the subjective interpretation assigned it by the plaintiff.[9] We find no traces of the threatening language that allegedly dissuaded the plaintiff from tendering his vested shares.

---

ties of how the plan would actually work. Any conflict as to the meaning of contract terms, however, is a matter of law for the court. See *Allstate Ins. Co.* v. *Bearce*, 412 Mass. 442, 446-447 (1992) (interpretation of unambiguous contract provision is question of law); *Cody* v. *Connecticut Gen. Life Ins. Co.*, 387 Mass. 142, 147 n.9 (1982) (plaintiff's subjective understanding of his benefits did not create ambiguity in contract).

[9]We reject the defendants' argument that a claim for violation of the covenant

As has been indicated, the text of the memorandum announces an informal policy encouraging employees not to tender their shares for sale, or to discuss with their operating heads their reasons for wanting to sell. The adoption of this policy was well within the discretion of the company, and the plaintiff's factual assertions that he understood the memorandum to threaten his employment should he tender his vested shares of Putnam stock, without more, does not begin to rise to the type of conduct that has been deemed to be a breach of the covenant of good faith and fair dealing. See *Harrison* v. *NetCentric Corp.*, 433 Mass. 465, 473-474 (2001) (plaintiff's argument that he understood unvested shares of company stock to represent compensation previously earned was belied by terms of stock agreement). See also *Willett* v. *Herrick*, 258 Mass. 585, 604, cert. denied, 275 U.S. 545 (1927) ("enforcement of a legal right by legal means is not evidence of duress").[10]

*Judgment affirmed.*

---

of good faith and fair dealing in the context of an employment relationship may never exist absent an allegation of a "bad faith" termination.

[10]Principles governing stockholders in close corporations have no bearing on the plaintiff's claim. Nor do we consider relevant the plaintiff's reliance on the factual assertions that stock in Putnam and ownership interests in Management are closely held and not publicly traded, and that there is no market for the purchase and sale of equitable interests or shares of stock in either entity.