**Joanne KUCHERA, Gary Kuchera, and Mary Williams, Plaintiffs,**

v.

**PAREXEL INTERNATIONAL CORPORATION, Defendant.**

**Civil Action No. 07–10815–NMG.**

United States District Court, D. Massachusetts.

June 16, 2010.

Andrea C. Kramer, Cyrus M. Perlman, Hirsch Roberts Weinstein LLP, Boston, MA, for Plaintiffs.

Kurt S. Kusiak, William G. Cosmas, Jr., Sally & Fitch LLP, Boston, MA, for Defendant.

## MEMORANDUM & ORDER

GORTON, District Judge.

Plaintiffs Joanne Kuchera ("Ms. Kuchera"), Gary Kuchera ("Mr. Kuchera") and Mary Williams ("Williams") bring suit against defendant Parexel International Corporation ("Parexel") for various common law claims and for violation of the Massachusetts Consumer Protection Act, M.G.L. c. 93A. Parexel, in turn, has filed counterclaims for breach of contract and breach of fiduciary duty. Before the Court are the parties' cross-motions for summary judgment.

### I. *Factual Background*

Plaintiff Joanne Kuchera was the founder and a shareholder of Integrated Marketing Concepts ("IMC"), a company working primarily in the field of recruitment and retention of patients for pharmaceutical drug trials. IMC offered a full range of patient recruitment and retention services, including finding and qualifying human subjects for drug trials, collecting metrics and storing data on the subjects, developing response mechanisms (such as interactive websites and toll free numbers) for the subjects and conducting focus groups. The other plaintiffs, Mr. Kuchera and Williams, are former shareholders of IMC. All three of the plaintiffs reside in Whitehall, Pennsylvania. Defendant Parexel is a bio/pharmaceutical services company incorporated in Delaware with its principal place of business in Waltham, Massachusetts.

Plaintiffs' complaint alleges that in late 2003 or early 2004, Parexel, which was seeking to expand its patient recruitment and retention business, approached Ms. Kuchera about the possibility of acquiring IMC. The plaintiffs allege that, although IMC was struggling financially at the time of the acquisition, Parexel was interested in acquiring IMC for "strategic" reasons, including, *inter alia,* leveraging IMC to increase sales in other units, keeping IMC from being acquired by a competitor and acquiring IMC's proprietary web-based data and trial management software, "RAPIDS".

On October 6, 2004, after several months of evaluation and due diligence, Parexel entered into a Stock Purchase Agreement ("SPA" or "the Agreement") with the former shareholders of IMC pursuant to which it acquired all of the shareholders' stock. Under the terms of the SPA, Parexel agreed to pay the shareholders $2,185,000 up-front, $600,000 one year after the closing and significant earn-out payments (up to $2,550,000) over the following three years based on the future financial performance of the IMC business unit within Parexel. The earn-out payments were to be measured by IMC's earnings before interest and taxes ("EBIT"). In the fall of 2005, after a dispute arose regarding the calculation of the first earn-out payment, the Agreement was amended to extend the first earn-out period and shorten the second and third periods.

Plaintiffs allege that Parexel never intended to pay the earn-out payments and that, after the acquisition, Parexel took steps to ensure that the plaintiffs would not receive them. Specifically, the plaintiffs allege that Parexel established a parallel internal organization, the Patient Recruitment Group ("PRG"), which was charged with the same functions that had previously been delegated to IMC. With the creation of PRG, Parexel effectively diverted work and revenue from IMC, preventing IMC's shareholders from meeting the targets necessary to achieve their earn-out payments.

The plaintiffs also allege that Parexel stripped Ms. Kuchera of any real authority with respect to and autonomy over IMC, failed to finalize lucrative contracts for IMC and deprived IMC of the resources and employees it needed to attract clients and generate revenue. As a result of Parexel's actions, IMC's financial performance suffered and it was unable to meet the targets required to achieve the payouts. The plaintiffs contend that Parexel's actions were fraudulent, taken in bad faith and in breach of the SPA.

## II. Procedural History

The plaintiffs' complaint, filed on April 27, 2007, alleges six counts against Parexel: 1) breach of contract (Count I), 2) breach of the implied covenant of good faith and fair dealing (Count II), 3) fraudulent inducement (Counts III and IV), 4) violation of the Massachusetts Consumer Protection statute, M.G.L. c. 93A, (Count V) and 6) for an accounting (Count VI).

On June 5, 2007, Parexel filed an answer in which it asserted numerous affirmative defenses and counterclaims for 1) breach of contract (against all counter-defendants) and 2) breach of fiduciary duty (against Ms. Kuchera only). Both parties have filed cross-motions for summary judgment on all of the claims against them.

## III. Analysis

### A. Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991)(quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Factual disputes that are irrelevant or unnecessary will not

be counted." *Id.* A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993). If, after viewing the record in the nonmoving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.

## B. Application
### 1. Defendant's Motion for Summary Judgment
### a. Breach of Contract and of the Implied Covenant of Good Faith and Fair Dealing

Parexel contends that it is entitled to summary judgment on Counts I and II because the plaintiffs cannot show that: 1) Parexel breached either the Agreement or the plaintiffs' reasonable expectations or 2) the plaintiffs suffered any damages as a result of Parexel's alleged breaches.

#### i. Breach of Contract and Implied Covenant

Massachusetts law recognizes that every contract contains an implied covenant that the parties will act in good faith and with fair dealing towards one another in performance of the contract. *Anthony's Pier Four, Inc. v. HBC Associates,* 411 Mass. 451, 583 N.E.2d 806, 820

(1991). Generally, the implied covenant of good faith and fair dealing provides that

> neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

*Id.* The purpose of the covenant is to guarantee that "the parties remain faithful to the intended and agreed expectations of the contract." *Eigerman v. Putnam Investments,* 450 Mass. 281, 877 N.E.2d 1258, 1264 (2007). A breach occurs, therefore, when one party violates the reasonable expectations of the other. *Id.*

Parexel contends that the plaintiffs' reasonable expectations as to how Parexel would perform the acquisition agreement were limited by the express language of Section 1.5(d) of the SPA which states:

> The [Sellers] agree and acknowledge that the buyer [Parexel] may make from time to time such business decisions as it deems appropriate in the conduct of the business and the buyers' businesses, including actions that may have an impact on EBIT, including, without limitation, closure of the business, and that [sellers] will have no right to claim any lost earn-out or any other damages as a result of such decisions so long as the actions were not taken by the Buyer in bad faith for the principal purpose of frustrating the provisions of Section 1.5.

Parexel insists that, in accordance with Section 1.5, so long as it does not take actions in bad faith for the principal purpose of frustrating the plaintiff's ability to meet the requisite earnings, the plaintiffs have no grounds for challenging its business decisions, even those that negatively impact IMC. The exercise of its contractually-granted discretion cannot, Parexel argues, violate the plaintiffs' reasonable expectations because the "implied covenant of good faith cannot override the express terms of a contract." *Dunkin' Donuts,*

*Inc. v. Panagakos,* 5 F.Supp.2d 57, 64 (D.Mass.1998).

Parexel's argument misses the mark. The plaintiffs do not claim that they were harmed by Parexel's poor business judgment or that Parexel had any contractual obligation to help them reach their EBIT targets. Rather, they claim that Parexel did precisely what the Agreement forbids, that is, its representatives took actions specifically designed to thwart IMC's ability to reach its earn-out targets.

Moreover, although Section 1.5 gives Parexel leeway to make business decisions that may impact IMC's EBITs, it does not give Parexel "carte blanche" to run IMC in any way it sees fit. Rather, it permits Parexel, from "time to time," to make "appropriate" business decisions so long as they are not taken "in bad faith" for the "principal purpose" of frustrating the earn-outs. Thus, decisions harming IMC that are not "appropriate" or that transpire more than occasionally are actionable whether or not they are taken with the principal purpose of frustrating IMC's earn-out potential. *Cf. Okmyansky v. Herbalife Int'l of America,* 415 F.3d 154, 158, n. 3 (1st Cir.2005) ("Ceding discretion in a contract is not tantamount to subjecting oneself to legalized tyranny ... not even the reservation of absolute discretion can clear the way for a totally arbitrary and unprincipled exercise of a contracting party's power.")

■ Parexel insists that the plaintiffs "simply have no substantive evidence that Parexel acted in bad faith." That contention, however, is belied by the plaintiffs' Concise Statement of Disputed Facts, which documents a multitude of actions that the plaintiffs contend were taken by Parexel to frustrate IMC's ability to reach its earn-out targets. Those actions include: 1) depriving Ms. Kuchera of functional autonomy over IMC, 2) failing to integrate IMC into Parexel, 3) refusing to finalize IMC's deals, 4) depriving IMC of sales and redirecting opportunities elsewhere, 5) creating an internal competing division (PRG), 6) encumbering IMC's financials with other units' expenses, 7) systematically reducing IMC's offerings and 8) redirecting projects to third parties and other Parexel units. The Court need only credit a few of those factual allegations to conclude that summary judgment on the plaintiffs' contract claims is unwarranted.

For example, the plaintiffs offer ample factual support for a juror to find that Parexel deprived Ms. Kuchera of functional autonomy in order deliberately to thwart IMC's attainment of its earn-out targets. Because Parexel understood that Ms. Kuchera's right to manage IMC was critical to its earn-out achievement, Parexel began taking steps to undermine her authority, including, *inter alia,* firing IMC's head of human resources without telling Ms. Kuchera, prohibiting Ms. Kuchera from having contact with Parexel employees, excluding her from emails and conversations that directly affected IMC's operations, failing to ask for her input on new policies governing IMC's working principles, ordering her not to attend meetings with IMC's clients and limiting her participation in any pharmaceutical bids.

Additionally, the plaintiffs allege that Parexel created an alternate internal organization, PRG, to supplant IMC and prevent it from achieving its earn-outs. Although Parexel claims that PRG was created to expand IMC's customer base and to help increase its revenue, the plaintiffs have proffered countervailing evidence that the purpose of PRG was not to help IMC but to harm it. For instance, the plaintiffs contend that the creation of PRG was not discussed with Ms. Kuchera and the person who eventually became its

head, Josh Schultz, was hired surreptitiously. Soon after PRG was formed, it began cutting IMC out of bids for clients and directing proposals to itself. The plaintiffs have also produced evidence that PRG never generated any business for IMC and that shortly after Ms. Kuchera was terminated, PRG closed down IMC while retaining its RAPIDS software and some of the contact centers with whom IMC had created relationships.

Finally, the plaintiffs offer sufficient evidence to support their claim that Parexel intentionally failed to integrate IMC into Parexel. For instance, the plaintiffs assert that Parexel did not incorporate IMC into its bid-estimating tool during the first two years of the earn-out period and declined to train its sales staff about IMC's offerings. Those actions, according to the plaintiffs, deprived IMC of potential revenue by limiting its ability to participate in Parexel bids and leverage Parexel for sales.

Parexel insists, however, that it expended considerable time and resources trying to integrate IMC into its bid-estimating tool and that it encouraged its sales force to promote IMC's services. Parexel's response, however, rather than demonstrating its entitlement to summary judgment, merely highlights the genuine issues of material fact regarding whether Parexel integrated IMC into its sales and, if not, whether it declined to do so in order to frustrate IMC's earn-outs.

Notwithstanding the factual disputes described above, Parexel insists that the plaintiffs' claims are untenable because it had no financial incentive to stifle IMC's growth given that the economic interests of the two entities were aligned. The plaintiffs, however, have proffered countervailing evidence to dispute that contention. Plaintiffs' expert, Christopher Barry, explained in his affidavit that even if IMC's EBITs did not reach the earn-out thresholds, Parexel would still be profitable. If, on the other hand, IMC exceeded the target, Parexel would be required to pay IMC's former shareholders significant earn-outs that would render it less profitable. Accordingly, unless Parexel believed that IMC could achieve EBITs significantly beyond the targets, it had an incentive to prevent IMC from reaching them. *See Horizon Holdings, LLC v. Genmar Holdings, Inc.,* 244 F.Supp.2d 1250, 1259 (D.Kan.2003) (rejecting similar argument on grounds that defendants believed they could still "turn a profit" from the acquired company's assets while simultaneously preventing it from realizing its earn-outs).

Parexel's argument is also flawed in that it is premised on the notion that Parexel's object in acquiring IMC was IMC's stand-alone, profit-earning potential. According to the plaintiffs, Parexel was not looking to IMC's revenue to recoup its investment but rather acquired IMC for various "strategic reasons," including 1) to help Parexel leverage additional business for its other divisions by offering improved patient recruitment capabilities, 2) to obtain IMC's proprietary software, RAPIDS (which would have taken over five years and cost an estimated $1.7 million to develop from scratch) and 3) to prevent Parexel's largest competitor from purchasing IMC.

In sum, the plaintiffs have offered ample evidence of actions that harmed IMC and frustrated its former shareholders' chances for an earn-out. Whether those actions were merely business disagreements or blunders (as Parexel claims) or deliberate actions taken in bad faith (as the plaintiffs claim), are quintessential jury questions.

### ii. Proof of Damages

Parexel next asserts that the plaintiffs have not provided sufficient evidence of damages. Specifically, Parexel contends

that even if the plaintiffs had sufficient evidence demonstrating that Parexel acted in bad faith, they have no evidence that its wrongful actions proximately caused them to miss their EBIT targets.

■ Parexel's argument is underwhelming. To survive a motion for summary judgment, the plaintiffs need not prove the precise amount of damages "with mathematical precision." *Coady v. Wellfleet*, 62 Mass.App.Ct. 237, 816 N.E.2d 124, 131 (2004). As long as the plaintiffs have established damages upon a "solid foundation in fact," uncertainty as to the amount does not bar recovery. *Air Safety, Inc. v. Roman Catholic Archbishop of Boston*, 94 F.3d 1, 4 (1st Cir.1996). Calculations of lost profits in the context of business torts are particularly difficult to prove with precision. *Coady*, 816 N.E.2d at 132.

■ Here, the disgruntled shareholders have proffered sufficient evidence that Parexel's allegedly wrongful actions deprived them of quantifiable revenue. Plaintiffs' damages expert, Christopher C. Barry, has opined that had IMC won the proposals and contracts it lost due to Parexel's actions, the shareholders would have been entitled to almost 2.5 million dollars in additional earn-outs. He arrived at that estimate by adding 1) the revenues reported by PRG (IMC's alleged internal competitor) and 2) the revenue from one of the projects that the plaintiffs allege was wrongfully outsourced to a third party), from which he subtracted incremental costs. Although the plaintiffs cannot aver with absolute certainty that IMC would have been awarded those contracts, the evidence they have proffered is sufficient for a reasonable jury to find that they suffered damages as a direct result of Parexel's actions.

#### b. Fraudulent Inducement

■ To succeed on their claims for fraudulent inducement, the plaintiffs must prove that 1) Parexel, with the intent to deceive, knowingly made a false statement that was material to the plaintiffs' decision to sign the SPA (and the amendment thereto) and 2) the plaintiffs relied on that statement to their detriment. *See Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 225 (1st Cir.2003).

■ In support of their fraudulent inducement claims, the plaintiffs assert that, before the parties signed the letter of intent for the acquisition, Parexel represented to IMC's shareholders, in writing, that after the acquisition,

> Joanne Kuchera w[ould] be able to run the business on a standalone basis with adequate functional autonomy to control EBIT.

That representation, the plaintiffs explain, was crucial to their decision to enter into the SPA. IMC's former shareholders had originally sought a system of compensation based on guaranteed deferred payments (rather than earn-outs based on EBITs). Parexel refused that proposal but managed to assuage the shareholders' concerns by making assurances regarding Ms. Kuchera's ability to manage IMC.

Parexel insists that the plaintiffs have no evidence that its statements' regarding Ms. Kuchera's autonomy were knowingly false or made with the intent to deceive. That claim is inaccurate. In resolving fraudulent inducement claims, courts often inquire as to whether parties ultimately followed through with their pre-contractual promises. *See, e.g., Kenda Corp.*, 329 F.3d at 226–7 (upholding jury finding in favor of plaintiff on fraudulent inducement based on evidence that defendant did not follow through with his promise to invest personal money in corporation). Here, IMC has proffered evidence that, immediately after

the acquisition, Parexel began to deprive Ms. Kuchera of functional autonomy over IMC. That evidence is sufficient to create a genuine, triable issue of fact with respect to the plaintiffs' fraudulent inducement claims.

Parexel next argues that the plaintiffs' reliance on its representations was patently unreasonable in light of the express language of Section 1.5 of the Agreement, which specifically allows Parexel to make business decisions regarding IMC. As discussed above, however, the provision in Section 1.5 enabling Parexel to make appropriate business decisions does not contradict its representation that Ms. Kuchera would be given enough autonomy to manage IMC as she saw fit. Accordingly, it would not have been unreasonable for the plaintiffs to rely on that representation in deciding whether to sign the Agreement.

Finally, Parexel asserts that the plaintiffs cannot prove that they suffered any damages as a result of Parexel's allegedly fraudulent misrepresentations. That argument fails for the same reasons set forth with respect to plaintiffs' alleged contract damages.

### c. Chapter 93A

■ Whether a particular set of circumstances constitutes an unfair or deceptive act under Chapter 93A is a questions of fact. *Incase, Inc. v. Timex Corp.*, 421 F.Supp.2d 226, 239 (D.Mass.2006). A finding that a party has *deliberately* breached a contract or violated the implied covenant of good faith and fair dealing can establish that a defendant's actions were an unfair or deceptive trade practice in violation of Chapter 93. *See Aware, Inc. v. Centillium Communications, Inc.*, 604 F.Supp.2d 306, 311 (D.Mass.2009); *Anthony's Pier Four*, 583 N.E.2d at 821.

Parexel asserts that because the plaintiffs cannot prove their claims for breach of contract and fraudulent inducement,

their Chapter 93A claim must fail as matter of law. Because those primary claims will survive Parexel's motion for summary judgment, however, plaintiffs' Chapter 93A claim, which involves the same factual issues, will survive as well.

### 2. Counter–Defendants' Motion for Summary Judgment

Parexel's counter-claim includes counts for breach of contract and breach of fiduciary duty. The plaintiffs (and counter-defendants) have moved for summary judgment on both of those counts.

### a. Breach of Contract

■ In Count I, Parexel alleges that the plaintiffs materially breached their obligations to Parexel by failing to pay certain Pennsylvania taxes which IMC had incurred prior to Parexel's acquisition of its stock. The plaintiffs have moved for summary judgment in their favor on the grounds that Parexel has failed to produce any probative evidence as to the amount of damages arising from the tax assessment. The plaintiffs' support for that motion is based on the fact that Parexel's Fed. R.Civ.P. 30(b)(6) designee, Josh Schultz, could not identify the amount of damages with any degree of certainty and referred to the need for a damages expert.

The plaintiffs' argument is unpersuasive. The fact that Parexel's 30(b)(6) witness could not recite the exact amount of damages does not bar Parexel's counter-claim from proceeding to trial. Parexel has proffered sufficient documentation of the damages it incurred as a result of the plaintiffs' alleged breach. Parexel's concise statement of facts indicates that, in Section 3.8 of the Agreement, IMC's shareholders warranted that all of IMC's tax returns were "complete and accurate in all material respects." Two years after the acquisition, however, the Commonwealth of Pennsylvania performed an audit

of IMC and found that IMC had underpaid more than $25,000 in sales and use taxes. Including interest and penalties, the total amount due to the Commonwealth attributable to IMC's operations was $36,971. Following an appeal, Parexel paid those taxes, plus interest and penalties.

Thus, Parexel has adequately demonstrated that it has incurred damages as a result of the plaintiffs' failure either to pay certain taxes or to indemnify Parexel for the amounts owed. Accordingly, judgment as a matter of law with respect to Parexel's breach of contract counterclaim is unwarranted.

### b. Breach of Fiduciary Duty

In Count II, Parexel alleges that Ms. Kuchera, as a key employee of Parexel, breached her fiduciary duty of loyalty by promoting her own interests in a manner injurious to Parexel. Specifically, Ms. Kuchera purportedly disparaged Parexel to prospective clients and employees, repeatedly complained about Parexel to her staff and spent work time "plotting" her litigation against Parexel.

The plaintiffs contend that Parexel's breach of fiduciary duty counterclaim, as well as its contract counterclaim, lacks evidence of damages. As a matter of law, however, Parexel need not present evidence of actual damages to support its claim for breach of fiduciary duty. *See Chelsea Industries, Inc. v. Gaffney*, 389 Mass. 1, 449 N.E.2d 320, 327 (1983). If Parexel can demonstrate that Ms. Kuchera breached her duty of loyalty to the company, it may recover the compensation it paid her during the period of the breach, unless Ms. Kuchera can demonstrate that the value of the work she performed equaled the compensation she received. *See id.* (allowing plaintiff corporation to recover compensation paid to disloyal employees notwithstanding lack of evidence that employees caused lost profits); *see also Or-*

*kin Exterminating Co., Inc. v. Rathje,* 72 F.3d 206, 208–09 (1st Cir.1995). Thus, because Parexel has offered some evidence that Ms. Kuchera breached her duty of loyalty, its counter-claim will survive notwithstanding the imprecise allegation of damages.

### ORDER

In accordance with the foregoing, Defendant's Motion for Summary Judgment (Docket No. 57) and Counter–Defendants' Cross–Motion for Summary Judgment (Docket No. 60) are **DENIED.**

**So ordered.**