JOHN RUSSO *vs.* ENTERPRISE REALTY CO., INC.

Middlesex.    April 7, 1964. — June 23, 1964.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & REARDON, JJ.

*Contract*, Construction, For sale of real estate, To build road, Performance and breach. *Equity Jurisdiction*, Specific performance. *License*.

The terms of a certain contract for sale and purchase of a lot in a tract contemplating a new way in the tract between the lot and a public way and approval of a subdivision of the tract by the municipal planning board under the subdivision control law obligated the seller by implication, although not by express promise, to construct the new way and to install therein a drainage system and water and sewer lines as required by the planning board.    [660–661]

Where it appeared that a contract for sale and purchase of a lot in a tract contemplated construction by the seller of a new way over the tract to a public way and approval of a subdivision of the tract by the municipal planning board under the subdivision control law, that the contract provided that there should be excepted from the lot as conveyed "so much" of the lot as was needed by the seller to comply with planning board requirements respecting the new way located "substantially as shown on" a plan attached to the contract on which the new way was designated as fifty feet wide, and that the seller knew before executing the contract that the planning board would require the new way to be sixty feet wide, it was held that the sixty foot new way conformed "substantially" to that "shown on" the plan.  [661]

Where it appeared that a contract for sale and purchase of a lot in a tract contemplated approval of a subdivision of the tract by the municipal planning board and obligated the seller to comply with planning board requirements respecting a new way in the tract, and that at the time for passing papers the subdivision had not been finally approved and the seller's application for approval had been dismissed without prejudice by reason of the seller's noncompliance with such requirements, a provision in the contract that if the seller should "be unable to . . . make conveyance as [t]herein stipulated, then . . . . all . . . obligations of the parties . . . [thereunder should] cease" did not preclude specific performance, at the instance of the purchaser, by a decree including an order to the seller to resubmit the subdivision plan to the planning board and upon approval thereof to comply with the board's requirements.  [661–662]

Where the seller under a contract for sale and purchase of land licensed the purchaser until a specified time to occupy and improve the land, which he did at substantial expense, and at the specified time the contract had not been performed through fault of the seller, it was proper in a suit in equity thereafter brought by the purchaser for specific performance to include in a decree for the plaintiff an injunction against termination of the license by the defendant pending a conveyance of the land and dismissal of a counterclaim by the defendant based on alleged wrongful occupancy of the land by the plaintiff.  [659–660, 662]

BILL IN EQUITY filed in the Superior Court on March 12, 1962.

The suit was heard by *Dewing*, J.

*Saul Andelman* (*Herbert S. Lerman* with him) for the defendant.

*Harry M. Lack* for the plaintiff.

REARDON, J.   This is a bill in equity brought by the buyer for the specific performance of a contract to sell land.   The judge filed a report of material facts.   From a decree granting relief to the plaintiff the defendant has appealed.   The evidence is reported.

The facts appear as follows: On January 11, 1960, after extensive negotiations Russo agreed in writing to buy, and Enterprise Realty Co., Inc. (Enterprise) to sell, for $20,000, a certain parcel of land (lot B) on the north bank of the Mystic River in Medford. The plaintiff wished to use the land for the operation of a marina. By the same agreement an option was granted to Russo to purchase for an additional $10,000 another plot (lot C) which adjoined lot B on the latter's eastern side.

Lots B and C occupied respectively the southwestern and southeastern corners of a large undivided tract of land (lot 15) owned by Enterprise under a registered land title. Lot 15 ran from the Revere Beach Parkway south to the Mystic River. The parties contemplated that Enterprise would build a road from the Revere Beach Parkway to the Mystic River along the western edge of lot 15. The sale and option of lots B and C were predicated in part upon the filing with and approval by the planning board of Medford (board) of a subdivision plan of lot 15. A private road connecting lot B to the public road system was necessary in order to secure board approval. Such approval was also required in order to record a deed to lot B in the land registration office. Attached to and made a part of the agreement of sale was a drawing entitled "Plan of Land Russo's Marine Mart" (the attached plan), which showed lots B and C, the remaining portion of lot 15, and the contemplated road designated as a "50′ roadway." The agreement contains the following: "There is to be excepted from the premises to be conveyed [lot B] so much thereof as may be required by the Seller so as to comply with the requirements of the Planning Board of . . . Medford . . . so as to validate the creation of the proposed street running from Revere Beach Parkway substantially as shown on said plan [and] obtain the approval by said Planning Board . . . of the plan to be filed with the Planning Board creating said proposed street so that the same may be filed for registration with Middlesex South Registry District so as to permit the Seller to subdivide its remaining land shown on

said plan . . . . As appurtenant to the premises to be conveyed the Seller shall grant to the Buyer the right to use the proposed street . . . ." Also: "The Buyer agrees that he will pay to the Seller an amount equal to twenty per cent (20%) of the cost to the Seller for the installation of water and other utility lines, sewerage and drainage lines from Revere Beach Parkway or from such other existing terminus to a point in the private street at or near the premises to be conveyed hereunder."[1]

The contract stipulated July 28, 1960, as the closing date "unless otherwise agreed upon in writing. . . . [T]ime is of the essence of this agreement." The parties further agreed that "if at closing time . . . [the subdivision] plan shall not have been approved by the . . . [b]oard . . . and the time within which an appeal from such decision shall not have terminated, then the closing time shall be postponed to a date . . . [fifteen days after either the decision on the appeal or approval by the board]." Finally, the contract provides that "[i]f the Seller shall be unable to give title or to make conveyance as herein stipulated, then any payments made under this agreement shall be refunded and all other obligations of the parties hereto shall cease and this agreement shall be void . . . ."

Enterprise had submitted to the board in 1959 a subdivision plan (the initial plan) drawn for it by one H. J. Nicholson, an experienced civil engineer and a former consultant to the board. On October 15, 1959, the board first informed Enterprise that the proposed roadway would have to be widened from 50 feet to 60 feet. Before submission of the initial plan Nicholson had estimated that an expenditure of between $30,000 and $40,000 would be sufficient to secure board approval of the plan. There is no evidence that such an estimate was ever communicated to Russo. In addition to the 60 foot roadway the board requested that other changes be made in the initial plan involving expense

---

[1] By a supplementary document the buyer's 20% share was amended to 10% and Enterprise later wrote to Russo: "It is understood and agreed that your 10% share . . . is to be based on the cost of such installation up to $75,000."

beyond what was originally estimated.  In one such change the board required construction of the drainage system which would cost some $38,000 at the time of the building of the road.  Nicholson had originally anticipated that the drainage could be put in at a later stage in the development of Enterprise's remaining portion of lot 15.  The board also required present construction of the water mains and the sewerage system.  From what appears the board made all the requests for changes prior to January 11, 1960, the date of the purchase and sale agreement.  With the changes incorporated the road with improvements was to cost some $105,000.

A board hearing on a revised definitive plan submitted by Enterprise and dated February 5, 1960, which embodied the changes as requested, was held on April 27, 1960.  Shortly thereafter the board tentatively approved the revised plan. Final approval could not be granted until either a construction bond was posted by Enterprise or the road and other improvements were actually constructed.  The bond has never been posted nor the road ever constructed.  As a result the application for approval was dismissed by the board without prejudice on September 13, 1961.

Extensions of the time of performance of the contract running until January 31, 1962, were mutually agreed upon by the parties.  Since that date Enterprise has regarded its contractual obligation at an end.

On September 6, 1960, the parties agreed that "until September 7, 1961, or until the aforesaid purchase and sale agreement, as amended, is terminated, whichever event occurs first," Russo should have the right to occupy and improve lots B and C.  The plaintiff went on the premises, "dredged the land, put in fill, made considerable grading of a large area so as to make it usable for his operation . . . built a [m]arina and hot-topped the roadway leading into the same . . . ."  He spent some $53,500 on these improvements until March 6, 1962, as indicated by evidence which was properly admitted.

The final decree ordered Enterprise to resubmit the definitive plan dated February 5, 1960, to the board for

approval. Within thirty days after such approval the defendant was directed either to post the necessary construction bond or to begin construction subject to weather limitations of the road designated in the plan and convey lots B and C to the plaintiff by a deed entitling him to a certificate of title. Until the conveyance of the land Enterprise was enjoined from terminating the license to occupy granted on September 6, 1960. A counterclaim based upon a wrongful occupancy by Russo was dismissed.

1. The judge correctly concluded that Enterprise was obligated by contract to construct "the proposed street running from Revere Beach Parkway substantially as shown on said plan." While the purchase and sale agreement does not contain an express promise by Enterprise to build the street, such an obligation was clearly intended by the parties. "An omission to express an intention cannot be supplied by conjecture. But if the instrument as a whole produces a conviction that a particular result was fixedly desired although not expressed by formal words, that defect may be supplied by implication and the underlying intention . . . may be effectuated, provided it is sufficiently declared by the entire instrument." *Dittemore* v. *Dickey,* 249 Mass. 95, 105. *Spaulding* v. *Morse,* 322 Mass. 149, 152–153. See *Proctor* v. *Union Coal Co.* 243 Mass. 428; *Eno Sys. Inc.* v. *Eno,* 311 Mass. 334, 338–340.

For this reason we are also of opinion that with respect to the drainage system and other improvements required by the board, Enterprise was obligated to do whatever was necessary to "obtain the approval by . . . [the board] of the plan to be filed with the . . . [board]." We note in this connection: (1) the board notified Enterprise prior to January 11, 1960, of the changes to be required in the initial plan before approval; (2) the contract provides that Russo was obligated to pay a percentage "of the cost to the Seller for the installation of water and other utility lines, sewerage and drainage lines"; (3) Enterprise itself acknowledged, again prior to January 11, 1960, that these other improvements could cost $75,000; and (4) the $30,000–$40,000

estimate appears not to have been communicated to Russo.

2.   We must next decide whether in all the circumstances here presented a street 60 feet wide conforms "substantially" to one of 50 foot width.   Enterprise knew before the signing of the contract that the wider road would be required.   Thus the question of whether it did conform substantially to that drawn on the attached plan had been posed to the defendant.   We must presume that both parties signed the agreement intending in good faith to be bound by it.   See *Shayeb* v. *Holland,* 321 Mass. 429, 432.   In our view, only a belief real or constructive on the part of Enterprise that there was a substantial conformity is consistent with its execution of the contract in good faith.   Believing otherwise the defendant would knowingly have been signing an agreement containing a readily available avenue of relief from its contract obligation.

Furthermore, the contract "except[s] from the premises to be conveyed *so much thereof* as may be required by the Seller so as to comply with the [board] requirements . . . so as to validate . . . the proposed street" (emphasis supplied), and lot B is described as bounded on its western side by the eastern edge of that street shown on the attached plan as 50 feet wide.   Thus the contract itself seems to recognize that there is a range of permissible increase in the street dimension set forth in the attached plan.   In this circumstance a 20% increase in width of the road does not seem so large as to make it in its new dimension "substantially" nonconformable with that originally planned.

3.   The defendant argues that a line of cases from *Old Colony Trust Co.* v. *Chauncey,* 214 Mass. 271, to *Barrett* v. *Carney,* 337 Mass. 466, bars specific performance here. These cases construe the provision, " [i]f the Seller shall be unable to give title or to make conveyance as herein stipulated, then . . . all other obligations of the parties hereto shall cease and this agreement shall be void," to mean that the seller who is without fault has no duty to make reasonable efforts to remove defects in title prior to the date of performance.   The line is inapposite.   Here Enterprise

has bound itself to do that which will suffice to remove the impediment to performance.

Enterprise contends that the order to construct a roadway of 60 foot width with improvements is defective because compliance with it is contingent upon the consent of third party abutting landowners not before this court. The factual basis for this contention does not appear in the record.

4. The defendant's counterclaim based upon a wrongful occupancy after the expiration of the September 6, 1960, license was properly dismissed. Enterprise may not capitalize on the result of its own breach of contract.

5. In summary, the plaintiff seeks only to compel Enterprise to do that which it contracted to do, and in the light of the foregoing the order must be

*Decree affirmed with costs of appeal.*