R & D CORPORATION *vs.* NEW BEDFORD REDEVELOPMENT AUTHORITY & another.[1] July 16, 1982. R & D Corporation[2] (R & D) seeks specific performance of an alleged agreement by the New Bedford Redevelopment Authority (the Authority) to extend a bulkhead thirty-six feet to the north along the Acushnet River in New Bedford and to fill an area behind the extended bulkhead. After trial (without jury) a Superior Court judge made findings and rulings.

*The Trial Judge's Findings*

(A) On December 18, 1970,[3] R & D made a contract (the 1970 contract) with the Authority to buy Lot C shown on a plan (the 1970 plan) recorded on September 24, 1970. On the same day the Authority conveyed Lot C to R & D by quitclaim deed (the 1970 deed). Lot C was part of a redevelopment project, by which "the Authority proposed to extend . . . the shortline in the [project] area . . . by constructing a bulkhead along" the Federal bulkhead line for "1650 feet and then to fill in the area landward [to the west] of the bulkhead, thereby preparing the adjacent parcels for industrial" and other specified uses. "Part of the bulkhead (1150 feet) was to be . . . adjacent to water of twenty-foot draft, while five hundred feet of bulkhead . . . [were] to adjoin water of thirty-foot draft." The judge also found that "[t]he construction of the bulkhead, filling of the land, and the division of the [p]roject area into lots . . . [were] reflected in the" 1970 plan. (This finding, as later language of the judge shows, must mean at most only that the 1970 plan sets out the general relationship of Lots C and D, the bulkhead line, and adjacent land.) "The Authority hoped to interest fish processors . . . in purchasing land in the [p]roject area" and approached R & D to see if it would purchase a lot for use by Tichon Seafood Corp. (Tichon Seafood). This corporation was controlled and owned by the Tichon family, which also owned R & D.

(B) Negotiations began with R & D about the possible sale to it of various "lots adjacent to twenty-foot draft water" (on which, in 1967 and 1969, R & D in fact made offers). In the spring of 1970, however, R & D made an offer to purchase Lot C which, for the most part, was near water of thirty-foot draft. "Although the Authority was . . . reluctant to sell the entire" frontage on 30-foot depth water to one purchaser, it finally accepted R & D's offer on May 11, 1970. Thereafter (before December 18, 1970, the date set for the closing) R & D submitted (as required by the

---

[1] The city of New Bedford.

[2] R & D formerly was known as D & R Realty Corp. To minimize confusion, the corporation is referred to as R & D throughout this opinion, although the change of name was not suggested to the Superior Court until August 26, 1980.

[3] The trial judge found this to be the date of the 1970 contract. The copy of the contract in the exhibits appendix shows that the date was December 18, 1969. The parties do not comment on this, so we assume that the date of execution of the contract is immaterial.

proposed 1970 contract, for the Authority's approval) plans for the plant which it proposed to build on Lot C.

(C) The Authority received on July 28, 1969, from the Department of Public Works (DPW) of the Commonwealth a license to build a bulkhead (east of Lots C and D) and to fill adjacent land. One plan accompanying the license differed from the 1970 plan in showing only 480 feet of bulkhead along Lot C and the river where there was thirty-foot depth, instead of 500 feet. When the bulkhead in fact was built, and the adjacent land was filled, the completed bulkhead extended (approximately north and south) only about 464 feet along the thirty-foot depth section. "Before December 18 . . . the bulkhead had been substantially built, and the land behind it was being filled and graded, although [the Authority's] formal acceptance of the . . . work . . . did not occur until July or August, 1971." R & D's plant was built by October, 1971.

(D) On December 7, 1970, the Authority conveyed to the city of New Bedford (the City) the strip of land five feet wide next east of the eastern boundary of Lot C on which the seaward (east) part of the bulkhead rests. The Authority then also gave the City an easement across Lot C for a box culvert "to carry runoff from . . . adjacent streets into the Acushnet River." (This conveyance also gave to the City an easement twenty feet wide over Lot D [just south of Lot C] from Hassey Street [which lies to the west of Lots C and D] to the bulkhead area. By the acceptance of this conveyance the City undertook to keep the bulkhead in repair until June 28, 2015.)

(E) On December 18, 1970, the Authority executed (a) the 1970 contract, the provisions of which survived the 1970 deed, and (b) the 1970 deed. Under the 1970 contract R & D was obligated to make carefully specified improvements on Lot C "in accordance with plans approved by the Authority." A certificate of completion of these R & D improvements was issued on December 4, 1972.

(F) R & D paid "no attention to its northeastern boundary . . . until . . . 1975, when the abutter to the north (Ell Vee Dee Freezer Corp.)" built a fence along part of the northern boundary of Lot C. R & D then had a survey made and markers were placed. One marker indicated that the northeast corner of Lot C (as shown by the 1970 plan) was under water. R & D's officers took no notice of the marker and did not discuss the situation with the surveyor whom they had hired.

(G) In 1977 Tichon Seafood decided to build an addition to its plant along the bulkhead to the north of its then existing building. Examination of Lot C at that time showed that R & D's frontage on the bulkhead (thirty-six feet less than that indicated on the 1970 plan) was insufficient for the proposed addition. R & D reported this to the Authority and asked that the Authority build an additional thirty-six feet of bulkhead and fill the adjacent land. The Authority refused, and this suit resulted.

(H) The facts concerning the northeast corner of Lot C were confirmed by a 1978 survey which revealed (1) that the total area of Lot C, as

shown on the 1970 plan, was 280,962 square feet and that the total area under water was only about 3,000 square feet, and (2) that the bulkhead frontage was only about 464 feet.

(I) Officers of R & D "were on Lot C during the construction of the" existing building and were there regularly "after its completion." They had opportunity to observe the site and the bulkhead for seven years before R & D made claim against the Authority.

*The Trial Judge's Rulings*

The trial judge made the following rulings among others.

(1) The 1970 deed and the 1970 contract each make reference to the 1970 plan. "The [1970 p]lan is merely a visual representation of the metes and bounds description contained in the [1970 c]ontract and the [1970 d]eed . . . with the exception . . . that the bulkhead is represented not as a single . . . line, but as a strip 5.00 to 5.03 feet in width."

(2) The Authority by the 1970 deed purported to "remise, release and quitclaim" Lot C to R & D. This effected a conveyance by the Authority of "all of *its* interest in Lot C." (This, of course, included the land west of and next to the whole 500 feet [north and south] of the City's strip of land about five feet wide.) See finding (D), *supra*. See also G.L. c. 183, §§ 11, 17. The trial judge did not find it necessary, nor do we, to decide whether there could be private ownership in land below the historic low water marks. See *Boston Waterfront Dev. Corp. v. Commonwealth*, 378 Mass. 629 (1979). He concluded merely that, as between the Authority and R & D, the latter had good title to the area, even though there had been no filling of, or building upon, the submerged area.

(3) The easterly boundary of Lot C, defined in the 1970 deed, as "south 14°, 26' 00" east in the west line of said [b]ulkhead 500.00 feet to Lot D of said [p]lan," must have reference to the west line of the bulkhead area conveyed to the City as indicated with precision on the 1970 plan. It cannot have reference to any physical aspect of the bulkhead as a "monument" (which would control courses and distances) for the bulkhead structure is a broad physical mass in "width . . . over fifty feet." (Thus the precise metes and bounds set out in the 1970 deed [consistently with the 1970 plan] were controlling. See Park, Real Estate Law §§ 241-246, especially at 317 [1981]. Compare *Ryan v. Stavros*, 348 Mass. 251, 258-260 [1964].) The bulkhead's width was shown on a drawing attached to the DPW license issued in 1969 to permit the construction.

(4) The 1970 deed, and the slightly earlier conveyance to the City, contain no covenant "binding upon the Authority as grantor" creating any "duty to build the bulkhead." The Authority's covenants are set out in a separate par. E of the 1970 deed and have no reference to construction of any part of the bulkhead or to filling any adjacent land.

(5) The 1970 deed (in par. F of that deed) incorporates by reference the 1970 contract. Part II of that contract states in § 101 in detail the work to be performed by the Authority. Although subsections (f) and (g)

of § 101 relate to filling and grading, they (in the context of the other pro-
visions of § 101) "seem to relate only to the filling and grading of land
necessitated by removal of [existing] structures" on Lot C.

(6) The trial judge perceived "no persuasive evidence of misrepresen-
tation" by the Authority. He determined "that the exact footage of land
along the bulkhead was not a material inducement to . . . [R & D] to pur-
chase Lot C" and that "the variance between the frontage expected and
that received was not so substantial as to warrant the relief requested."
On the evidence "the predominant inducement" was "the location of Lot C
off water of thirty-foot draft . . . ." R & D needed "sufficient usable land
to carry out the building program . . . projected at the time of the [1969-
1970] negotiations" and wanted the "*entire stretch* of frontage along the
thirty-foot draft section of the bulkhead," so as not "to share Lot C with
another concern." That "the actual number of feet" was not an inducing
consideration is indicated by R & D's failure to discover the deficiency in
frontage between 1970 and 1978, even after the 1975 survey.

(7) "[W]hatever expectation . . . [R & D] had for the additional thirty-
six feet of [bulkhead] frontage, the damage . . . as a result of its absence is
slight." The missing frontage is seven percent of the expected total front-
age and the "area under water is only one percent of the [total] area of Lot
C." The differences between the actual and expected frontage and area
are "not so great as to raise a presumption of fraud or gross mistake." See
*Noble* v. *Googins*, 99 Mass. 231, 235 (1868). Compare *Overly* v. *Treasur-
er & Recr. Gen.*, 344 Mass. 188, 192-193 (1962).

(8) The case is not governed by *Russo* v. *Enterprise Realty Co.*, 347
Mass. 655 (1964), where the grantor was held obliged by the purchase and
sale agreement (which referred to the parties' intention that a street be
provided) to construct a street, although the agreement contained no ex-
press promise to do so. Here, in the 1970 deed and the long 1970 agree-
ment there is only slight, incidental reference to the bulkhead and no
mention of any explicit obligation of the Authority to build or extend it.

(9) "[N]o liability [of the Authority] has been demonstrated by" R & D
and the "question of remedy does not properly arise."

\*   \*   \*   \*

1. So far as the trial judge's findings and conclusions rest, in whole or
in part, on oral evidence, we are of opinion that they are justified by the
testimony read in connection with documents in the record. We are left
with no sense that any of the trial judge's findings and conclusions, based
in part on oral testimony, were clearly erroneous. See *Norton* v. *West*, 8
Mass. App. Ct. 348, 350 (1979), and cases cited.

2. R & D contends that, in determining the extent of the Authority's
undertakings (if any) under the 1970 contract, the trial judge failed ade-
quately to consider five documents referred to in the 1970 contract, viz.
(a) the 1970 plan; (b) the 1970 easement given by the Authority to the
City relating to a box culvert; (c) another 1970 easement granted by the

Authority concerning the bulkhead and its maintenance; (d) an urban renewal plan, dated March 17, 1969; and (e) a cooperation agreement between the Authority and the City, dated July 20, 1965.

(a) The judge gave full consideration to the 1970 plan and recognized that the plan was used in some respects in connection with the disposition of the land (Lots C & D) shown on the plan. The only reference, however, on the 1970 plan to the bulkhead was near the portion of the plan portraying the strip five feet wide (east of Lot C) conveyed to the City on December 7, 1970. Next to the plan's portrayal of the easterly line of that strip were the words "Combined Pierhead and Bulkhead Line." There is no reference whatsoever on the 1970 plan to any filling of Lot C. The approximate lines of the box culvert easement granted by the Authority to the City in December, 1970, prior to the 1970 deed to R & D, are shown as extending (beyond the actual bulkhead construction and over the submerged area) to the northern boundary of Lot C as described in the 1970 deed. An official of R & D testified that R & D retained no engineer to interpret the 1970 plans for the company before accepting the deed.

(b) The judge's decision shows that he also gave ample consideration to the provisions of the instruments granting easements (over or near Lot C) to the City. He took into account the respects already noted in which the interests and the easements thus granted purported to extend to the northern boundary of Lot C. We perceive nothing in these grants of easements (to at least one of which Lot C, in the hands of R & D, was subject) which created any obligation on the Authority with respect either to the bulkhead or to filling the submerged land. To the extent that no bulkhead was on the ground for the last thirty-six feet of the City's five foot strip, the Authority had given R & D by the 1970 deed a quitclaim release of all interests that it then had.

(c) The opening recitals in the 1970 contract concerning the urban renewal plan appear to be merely formal and contain no covenants. Indeed, at their conclusion, each party purports to "covenant and agree with the other *as follows*" (emphasis supplied). The trial judge adequately dealt with the only provision of the 1970 contract (viz. § 101) which purports to describe "Work to be Performed by Agency" (i.e. the Authority). See ruling (5) above. Examination of the original urban renewal plans does not disclose any specific provisions which could be construed as obligations undertaken by the Authority with respect to the bulkhead on and adjacent to Lot C and the submerged area on Lot C. The statements in the 1969 urban renewal plan, under the heading "Land Use Plan," are exceedingly general and set out only "major aims and objectives." An example of such an objective was "[t]o provide a new bulkhead for the offloading of fish and other items adjacent to the new fish and food processing areas, together with a dredged area adjacent thereto of sufficient draft for large vessels to dock, berth and maneuver." We cannot view such diffuse language as amounting to an assumption by the Authority of any spe-

cific obligation.  We see no special present relevance (to the issues of this case) of the 1965 and 1966 cooperation agreements referred to in the recitals of the 1970 contract.

3.  The execution of the renewal project and the construction of the bulkhead were dependent upon procuring the DPW license of July 28, 1969.  The plan attached to that license clearly established that the bulkhead was to extend to the north at most only to a point twenty feet short of the northern boundary of Lot C as defined by metes and bounds.  The 1970 deed expressly stated that the conveyance by that deed was "subject to . . . [p]resent and future laws, ordinances, resolutions, regulations, and orders of all municipal, county, State, Federal or other government bodies, boards, agencies, or other authority now or hereafter having jurisdiction."  The license of the DPW was at least a resolution or an order.  Also the trial judge found (see finding [C] above) that the bulkhead, promptly built pursuant to that license, "had been substantially built" before December 18, 1970, when the 1970 deed was given, and that the land behind the bulkhead "was being filled and graded."  R & D, as grantee, had full opportunity to know of the then state of Lot C, before it accepted the 1970 deed.  The trial judge was entitled to take these circumstances into account, in appraising the 1970 documents and the testimony, as fully as he did the prior negotiations, concerning which he heard extensive testimony.

4.  The trial judge, in our opinion, correctly treated the case of *Russo* v. *Enterprise Realty Co.*, 347 Mass. 655 (1964), as inapplicable to the 1970 contract now before us.  See ruling (8), *supra*.  That document was a carefully drawn, integrated instrument made by a public authority to carry out an urban renewal project, in part at least supported with public funds.  The instrument indicates effort to express all the obligations of each party.  It was carried out by the 1970 (quitclaim) deed.  No 1970 instrument contains any explicit undertaking by the Authority with respect to the completeness of the bulkhead.  The precise location of the substantially completed bulkhead was obvious on the ground before the 1970 instruments were executed.  Plans in evidence show that at its northern end the bulkhead curved to the west into Lot C for a significant distance (just south of the submerged portion of Lot C), a very clear indication that the bulkhead was not to be extended further.  The principles stated in *Stop & Shop, Inc.* v. *Ganem*, 347 Mass. 697, 701 (1964), against the extension of covenants "by implication unless the implication is clear and undoubted" should control interpretation of the 1970 instruments.  See *Thomas* v. *Christensen*, 12 Mass. App. Ct. 169, 176-177 (1981); Restatement (Second) of Contracts, §§ 204, 209, 211-213 (1979).  The indication in this case of any obligation is much less explicit and the whole situation much less clear than that which led to the implication of a possible easement in *Case* v. *Morrisette*, 475 F.2d 1300, 1311-1314 (D.C. Cir. 1973).

5.  The trial judge correctly concluded that, in the circumstances, the Authority had assumed no obligations beyond those expressly stated in the

1970 deed; that there was no "mispresentation" by the Authority; and that the "exact footage . . . along the bulkhead was not a material inducement" to R & D's purchase of Lot C. There was no basis for specific performance and no breach of contract for which an award of damages need be made.

*Judgments affirmed.*

*Kenneth H. Tatarian* for the plaintiff.
*Raymond A. Letourneau* for the defendants.